# IN RE: ESTATE OF ACHELIS

## Case No. 86-391-CP

Nineteenth Judicial Circuit, Martin County

August 11, 1989

**APPEARANCES OF COUNSEL**

**John Erick Sward,** for Personal Representative.
**Jeffrey M. Kirsch,** for Devereux P. Wight.

**OPINION OF THE COURT**

JOHN E. FENNELLY, Circuit Judge.

*ORDER ON PETITION OF DEVEREUX P. WIGHT TO REVOKE PROBATE*

THIS MATTER came on for Hearing pursuant to the Petition of DEVEREUX P. WIGHT. Petitioner seeks to revoke probate on two grounds: (1) Lack of testamentary capacity of the decedent, ALMA P. ACHELIS, and (2) Undue Influence by KATRIN P. ACHELIS over the decedent, ALMA P. ACHELIS. The Court, having heard testimony and reviewed the documentary evidence, makes the following findings of fact and conclusions of law.

At the outset, it should be noted that adequate resolution of this particularly bitter and protracted case requires a somewhat lengthy discussion of the relations between the parties.

ALMA "PINKY" ACHELIS, the decedent in this case, was the widow of MR. JOHN "JACK" ACHELIS. MR. ACHELIS preceded her in death. ALMA was MR. ACHELIS' second wife. He had two children, KATRIN and DAVID, from his prior marriage.

MR. ACHELIS divorced his first wife, mother of KATRIN and DAVID, and married ALMA. The evidence established not surprisingly that relations between KATRIN, DAVID and ALMA were initially strained. The evidence further established that after this initial period of estrangement relations between ALMA and the children improved.

Prior to MR. ACHELIS' death, the couple enjoyed a relatively affluent life style wintering in Florida and spending summers on Martha's Vineyard in Massachusetts. ALMA, the testimony revealed, particularly enjoyed the home, Hearths and Flowers, on Martha's Vineyard. This home was, after MR. ACHELIS' death, under the effective control of KATRIN and DAVID ACHELIS. MR. ACHELIS, prior to his death in May of 1980, communicated to his children a desire that ALMA enjoy the use of the home. ALMA was not allowed to use the Massachusetts home and it appears that relations between her and KATRIN ACHELIS were again strained.

As an aside, ALMA, prior to JACK'S death, executed a will which named DAVID and KATRIN as beneficiaries if JACK predeceased her. After JACK'S death and after the house was not made available, ALMA executed a second will naming her brother as residuary beneficiary. It is noteworthy that prior to execution of this second will, relations between ALMA and DEVEREUX were distant. There matters stood until July of 1984.

ALMA ACHELIS, in July of 1984, suffered a stroke that had permanent effects and radically altered her life. The medical testimony reflects a poignant struggle, by doctors in both Massachusetts and Florida, to adjust medications needed to prevent further seizures and ensure lucidity. The evidence establishes that when her medications were balanced she was lucid and remained what she had been throughout her life, a strong willed woman. Chemical imbalances, however, produced a marked change that rendered her incompetent. This unfortunate lady was, therefore, the subject of dramatic behavior changes from July, 1984, until her death.

After hospitalizations in Massachusetts following her stroke, ALMA was confined to a nursing home until December, 1984. At that time, DEVEREUX arranged for her discharge from the nursing home and her transportation to Stuart, Florida. Upon arrival at Stuart, she was

150

hospitalized because of medication imbalances. She was at that time clearly incompetent.

Her physicians, however, were able to successfully treat her and she was discharged. DEVEREUX at this time took his sister to MR. JOHN FENNIMAN, the family attorney, who had prepared the first and second will. MRS. ACHELIS on December 26, 1984, executed a general power of attorney in favor of DEVEREUX. MR. FENNIMAN described her as not quite as sharp but conversant and resolutely opposed to her brother being named as guardian of her person or property. DEVEREUX, the evidence shows, left Stuart on January 1, 1985, with ALMA'S checkbook and automobile. The evidence reflects that ALMA was angry about this and that MR. WIGHT never accounted for these funds. He was never again involved in his sister's affairs.

KATRIN ACHELIS now assumed an active role in the management of ALMA'S personal and financial affairs. She arranged companions and nursing care. KATRIN visited ALMA and discussed testamentary matters. KATRIN left Stuart and returned to Massachusetts. KATRIN, in Massachusetts, prepared the third will and mailed it to Stuart where it was executed on March 11, 1985. The third will represented a major change in distribution that benefited KATRIN ACHELIS.

MR. STUART ROGERS, a retired New Hampshire attorney with extensive probate experience, and his wife, MRS. PHYLLIS ROGERS, testified concerning execution of the will and the relationships of the various parties to this action. MR. ROGERS testified that he questioned ALMA concerning the document, and that she fully aware that the document was a will. She appeared alert, and was in his opinion aware of its contents. MR. ROGERS further testified that as an attorney, he would not witness any will if he had the slightest doubt about the mental competence of a testator. In MR. ROGERS' opinion, the decedent was fully competent. This view was fully shared by MRS. ROGERS who also witnessed the third will.

MR. and MRS. ROGERS also testified concerning the decedent's feelings concerning the Petitioner after his return to New York. This unimpeached testimony from two totally disinterested witnesses supports a conclusion that the decedent was extremely angry about the Petitioner's handling of her money and automobile.

After execution, the will remained with the decedent until she went to Massachusetts. A copy of the will was then mailed to MELVILLE CHAPIN, ESQ., a Massachusetts lawyer. MR. CHAPIN testified that it conformed to what he understood to be her wishes.

151

MR. MELVIN CHAPIN and MRS. ROGERS both spoke to ALMA after the will was executed and in their view, ALMA, although physically weakened, was competent after her return to Massachusetts.

It is, of course, axiomatic that a person must possess testamentary capacity in order to execute a valid will. It is equally true that a person who suffers from periodic incidents of incompetency may execute a valid will during what has come to be called a lucid interval. *In Re Estate of Blakey*, 363 So.2d 630 (Fla. 3d DCA 1978).

The Court concludes that the credible evidence supports a conclusion that the will in question was executed during a lucid interval. The Court has carefully considered evidence of the decedent's post stroke condition. However, the testimony of MR. and MRS. ROGERS considered in conjunction with the testimony of ALMA'S physician discussed previously supports a finding that the decedent executed the March 11 will when she was competent to so act.

The foregoing conclusion is not dispositive of the issues in this case. As indicated, the will in question was executed when the testatrix was, to say the least, physically weakened by a serious illness. KATRIN'S activities, both before and after execution show clearly that she was exercising control over the decedent. The evidence demonstrates beyond travail that she was also active in the procurement of the will and was a substantial beneficiary.

In the landmark case, *In Re Estate of Carpenter*, 253 So.2d 697 (Fla. 1971), Justice McCain delineated the parameters of what constitutes a presumption of undue influence, in a comprehensive and penetrating analysis of the history of undue influence in Florida case law. Under the *Carpenter* rule, a rebuttable presumption of undue influence arises when evidence demonstrates (1) a confidential relationship between a testator and a beneficiary, (2) active procurement of the will by the person occupying the special relationship, and (3) substantial benefit in the will to the person occupying the confidential relationship.

Justice McCain defined a confidential relationship in particularly broad terms and as being any relationship where " . . . one man trust in and relies upon another . . . the duties and relations may be moral, social, domestic, or merely personal." *(Carpenter* at page 701). As the recent case of *Blades v Ward*, 475 So.2d 935 (Fla. 3d DCA 1985) demonstrates, the continuing vitality of Justice McCain's definition can not be seriously disputed at this juncture.

The facts concerning the relationship between KATRIN and the decedent are remarkably similar to those in the *Blades* case noted

152

*supra.* Thus the Court finds that at the time of the execution of the will the social and personal relations amply support a conclusion that a confidential relationship existed between KATRIN and ALMA ACHELIS.

KATRIN ACHELIS also actively discussed the terms of the March 11 will with ALMA, encouraged her to make the will, and finally prepared the will. Thus the record clearly supports a finding of active procurement. See *Elson v Vargis,* 520 So.2d 76 (Fla. 3d DCA 1988).

Since the will substantially benefits KATRIN ACHELIS, the Court finds that the Petitioner has made an evidentiary showing that is sufficient to raise the rebuttable presumption of undue influence. *(Carpenter* at page 702).

In the face of the presumption, it is incumbent upon the adversary to present to the Court a reasonable explanation to overcome the presumption. *(Sun Bank/Miami, N.A. v Hogmann,* 536 So.2d 263 (Fla. 3d DCA 1988).

The nature of the relationship between ALMA and her brother is analogous to the one described in *Vargis* noted *supra.* In addition, the credible evidence would support a conclusion that ALMA believed her brother had taken money and her automobile from her. This in and of itself would supply a reasonable explanation for the testamentary change.

There is, however, more. MR. WIGHT had little or no contact with his sister after December of 1984. ALMA turned to KATRIN for help. This in the court's view is sufficient to explain her increased role in the decedent's affairs. *Fogel v Swann,* 523 So.2d 1227 (Fla. 3d DCA 1988).

Finally, the evidence reflects that for almost one year after execution of this will, ALMA, although described by parties as lucid, make no effort to revoke the will. This is also a fact of significance. *In Re Estate of Lane,* 492 So.2d 395 at 398 (Fla. 4th DCA 1986).

Thus, in the Court's view, there exists a reasonable explanation for the disposition in question. This is a close case and the Court has considered, as it must, all of the evidence. However, the credible evidence supports the conclusion that ALMA ACHELIS possessed testamentary capacity and was not the subject of undue influence.

The Court reserves jurisdiction with regard to fees and costs and directs the Personal Representative to complete estate administration within 90 days of this Order.

ORDERED IN CHAMBERS at the Martin County Courthouse, City of Stuart, Martin County, Florida, on this 11th day of August, 1989.